J^SHORTESS, J.
Sophie D. Schopp fell at home on August 2, 1993. She was treated in the emergency room of Our Lady of the Lake Hospital (OLOL), admitted to the hospital, where a craniotomy was performed to evacuate a subdural hematoma, and died fourteen days later. Her sons, Daniel C. Schopp and Norbert Richard Schopp (plaintiffs), filed suit against Our Lady of the Lake Hospital, Inc. (defendant), and two of defendant’s x-ray technologists, Darren M. Coates and Sharon Sue Smith[1], alleging her death was caused by the negligence of Coates and Smith in dropping an x-ray cassette on her head while she was undergoing a skull x-ray. Plaintiffs later dismissed Coates and Smith but proceeded to jury trial against defendant. The jury rendered a verdict in favor of plaintiffs, awarding damages for Mrs. Schopp’s pain and suffering and medical expenses, as well as her funeral and memorial expenses. The jury also awarded each son $50,000.00 in general damages. The trial court rendered judgment in accordance with the verdict. Defendant appeals the finding of liability. Plaintiffs answered the appeal seeking an increase in the amount of general damages awarded for wrongful death.
*340 FACTUAL BACKGROUND
Although crippled with arthritis, seventy-five year-old Sophie Schopp (Schopp) lived alone. At approximately 3:30 a.m. on August 2, 1993, she stumbled coming from her bathroom and fell, striking her head. She was unable to get up and lay on the floor until approximately 8:00 a.m., when a home health aide, Daisy Montgomery, came to her home for her daily visit. Her doors were locked, but Schopp told Montgomery to go across the street and get a key, which she did. Emergency medical services arrived shortly thereafter and took Schopp to OLOL. Her friend and neighbor, Eloise Guwang, followed in her car. Schopp’s friend Fran P. Haper also came to OLOL that morning.
Schopp was taken for skull x-rays, and when she returned, the x-ray technologist, Darren M. Coates, told Haper and Gu-wang there had been “a little accident.” Haper testified Coates stated, “[T]he x-ray plate fell on her head.” He pointed to Schopp’s head and showed Haper where it had fallen on her. Haper stated she saw no mark or bruise and thought nothing more of it. Guwang testified, however, |3that she pushed back Schopp’s hair and saw a blue mark on the left side of her forehead. Guwang testified she knew Schopp was hurt. According to Guwang, Schopp told her Coates and Smith were “cutting up” when Smith let the x-ray cartridge slip, and it fell on her head. Schopp did not tell Guwang from what distance the cartridge fell.
Coates testified Schopp was lying on the x-ray table when the accident occurred. He and Smith had already taken one view and were getting ready to take another. He was adjusting the x-ray tube while Smith was positioning the cassette and Schopp’s head. He demonstrated how the cassette fits vertically into the stand, while the patient’s head lies on the base of the stand. He saw the cassette begin to tip. He reached and caught it at the same time it hit her head. He stated the cassette “barely tapped her on the head .” He asked her if she was okay, and she replied that she did not know. He stated he asked her “more out of politeness than necessarily concern” because he knew the cassette did not hurt her. They then took the x-ray and took her back to the emergency room, where he told her “family” that the cassette had bumped her. He told them to tell the doctor if she had any pain.
Smith testified she did not see the cassette fall. Coates centered the cassette while she aligned Schopp’s head. She looked toward Coates, saw him reach forward, looked down, and saw the cassette resting against Schopp’s head. She asked Schopp if she was all right. Schopp did not respond at first, then said she did not know. Smith denied that she and Coates were “cutting up.” She was concerned Schopp might have been hurt and knew they had to file an incident report with OLOL.
Dr. Joseph M. Allain was the emergency-room physician on duty on August 2 when Schopp arrived at OLOL. He found her to be awake and alert but in considerable pain, primarily from a bruise to her left elbow. She also had a bruise around her right eye. He ordered x-rays of her elbow and skull. The x-rays were negative, but after consulting with Dr. Jed Morris, her internist, he decided to admit her overnight for observation. After she was admitted, a female x-ray technologist came to him “kind of scared and said that they dropped a plate on her” and that it fell on her face.[2]
Morris, a physician board certified in internal medicine, with a subspecialty in rheumatology, had treated Schopp for ten years. Allain called him that morning when 14Schopp was seen in the emergency room. Allain told him the area around Schopp’s right eye was injured, but they had absolutely no discussion about Schopp *341 having neurological problems. Allain assured him Schopp was entirely stable.
That afternoon, however, he received a “panic call” from a nurse who was “absolutely terrified.” The nurse told him an x-ray cartridge had been dropped on Schopp, she had had an injury to her cranium, she had an excruciating headache, and she did not look good. Morris ordered a CT scan for Schopp, then finished seeing the patients at his office. About an hour later, he arrived at the hospital and went to Schopp’s room. She was obviously not herself; she recognized him anpl could speak, but the “distinctness of her mentality” was gone. He rushed to her and asked, “Sophie, what’s wrong?” She told him an x-ray cassette had been dropped on her, then lifted her hand to her head and said, “It hit me here.” He noticed swelling and puffiness in the area where she pointed. Within minutes after that, she lost consciousness “right before [his] eyes .”
Morris stated he was confident Schopp gave him an accurate history. There was “no question in [his] mind whatsoever” that she was coherent when she showed him where the cartridge hit her. Although his dictated notes state that she was arousable but unable to give a history, he explained that that was her condition when he was dictating, not when he first saw her.
The CT scan showed Schopp had a large acute subdural hematoma, which is a collection of blood between the dura, or cover of the brain, and the brain itself. Dr. Thomas P. Perone, a board-certified neurosurgeon, performed surgery to evacuate the hematoma. Although Schopp seemed to improve initially following the surgery, her health declined thereafter, and she died on August 16, 1998.
CAUSATION
Defendant contends the trial court was manifestly erroneous in finding Schopp’s subdural hematoma was caused by the negligence of OLOL or its employees. Defendant contends the “only direct factual testimony and only true expert testimony offered at trial contradicted that finding.”
Defendant contends the cassette only brushed or tapped Schopp’s head and thus could not have caused a hematoma. It relies on the testimony of Smith and Coates. Plaintiffs, on the other hand, rely on the statements of the nurse who called [BMorris, Smith’s statement to Allain, and Schopp’s statement to Morris that the cartridge had been “dropped” on her head. Defendant also contends Perone’s operative note that there was no bruise on the left side of Schopp’s head shows that even if the cartridge was dropped on her head, it was not done with enough force to cause a hematoma. Perone’s notation is contradicted, however, by Guwang’s testimony that she saw a blue mark on the left side of Schopp’s head and Morris’s testimony that he saw swelling and puffiness in the area where Schopp indicated the cartridge had hit her.
Defendant also contends the testimony of its experts was more credible than that of Morris. Perone testified that, in his opinion, Schopp’s subdural hematoma was caused by her fall at home. He explained that although she hit the right side of her head in the fall, it is common for blood vessels on the opposite side of the brain to stretch and tear as the atrophied brain of an elderly person moves around inside his or her skull during a fall. This phenomenon is called a contrecoup injury. He admitted his opinion was based primarily on the description of the x-ray incident given by Coates and Smith, but he believed that even if they had dropped an x-ray cartridge on her, the blow could not have caused a subdural hematoma. He stated the cartridge would had to have been dropped from higher than the ceiling to cause the size hematoma she had.
Because Perone was chief of staff at OLOL at the time of trial and defendant was afraid he might be perceived as biased *342 in its favor, defendant also presented the video testimony of Dr. Jack A. Hurst, a Lafayette neurosurgeon. Hurst testified the most likely cause of Schopp’s subdural hematoma was her fall at home. He stated the cartridge would have to be dropped on Schopp from a height of a meter or more to present enough force to cause a subdural hematoma, and according to the technologist’s version of the incident, the cartridge fell only two millimeters, or less than one inch. He believed the technologists’ version of the incident rather than the history Schopp gave to Morris. He stated that in Morris’s discovery deposition, Morris stated Schopp was lethargic and delirious when he first saw her. Based on that statement, he had some “credibility difficulty” with Morris’s testimony regarding Schopp’s history that the cartridge was dropped on her head.
Hurst also attacked Morris’s qualifications to give an opinion as to the cause of the hematoma. He stated he saw “living bleeding brain[s]” three to five times a week, while Morris had not seen one since medical school. “More importantly,” he stated, “I |fiknow that I know how [subdural hematomas] evolve, I don’t just think.” He said a blow from the x-ray cartridge could not cause a subdural hematoma, although “one who has never seen a subdural hematoma much less operated on one could come to that conclusion.”
Morris gave very moving testimony regarding Schopp’s injury. He was emphatic that he had the education and experience to give an opinion as to causation. He stated that while he did not operate, he made the diagnoses that led to surgery. He pointed out he was the one who diagnosed the subdural hematoma. He stated there was no doubt in his mind that the incident in the x-ray room caused the he-matoma. He believed the cartridge was dropped on Schopp’s head based on her statements to him and the alarmed tone in the nurse’s voice when she called him to report the x-ray incident. He saw the soft tissue swelling on Schopp’s head and noted the hematoma was in the exact place she had shown him where the cartridge struck her. He stated that to him, this was “an obvious cause and effect.”
The standard of appellate review of factual findings is a two-part test: 1) the appellate court must find from the record there is a reasonable factual basis for the finding of the trial court, and 2) the appellate court must further determine the record establishes the finding is not clearly wrong (manifestly erroneous).[3] Factual findings should not be reversed on appeal absent manifest error.[4] If the trial court’s or jury’s findings are reasonable in light of the record reviewed in its entirety, the court of appeal may not reverse.[5] Consequently, when there are two permissible views of the evidence, the fact finder’s choice between them cannot be manifestly erroneous or clearly wrong.[6]
In this case, there were two versions of the x-ray-room incident: either the cartridge tilted less than an inch and barely brushed Schopp’s head, leaving no mark, or it was dropped from some distance and struck her with enough force to leave a soft-tissue injury. The jury obviously believed the second version. There were also two opinions as to causation, that of Perone and Hurst, based on the first version of the incident, and that of Morris, based on the second. The jury must have believed Morris’s |7opinion. Based on our review of the entire record, including the transcript, the video and written depositions, the medical records, and the x-ray stand and cartridge, we find this was a *343 permissible view; it thus cannot be manifestly erroneous.[7]
ERRONEOUS JURY CHARGE
Defendant contends the trial court erred in giving a jury charge regarding aggravation of a pre-existing condition. After the jury retired for deliberations, defendant objected to the charge, and the trial judge stated he had intended to omit that instruction. Because this case was tried and argued throughout as an either/or case, i.e., either the hematoma was caused by the fall or by the x-ray cartridge, we find this error to be harmless.
QUANTUM
Plaintiffs’ answer to the appeal contends the $50,000.00 award of general damages to each of them was inadequate. Dan and Richard Schopp are twins. They were forty-eight years old at the time of their mother’s death. Dan is a dentist who lives in Georgia. Richard is a lawyer who lives in Florida. Dan testified he called his mother at least once a week and visited her every four to six weeks, on average. She counseled him about his marital problems, and he missed her counseling. Richard testified his relationship with his mother was “sometimes close, sometimes just because we were physically apart it was distant.”. He called her every Sunday night and tried to stay as close as they could. He stated he missed those Sunday night conversations with her because she was a good listener and conversationalist. We find the award of $50,-000.00 in general damages, while low, is not abusively so.
CONCLUSION
For the foregoing reasons, the judgment of the trial court in favor of plaintiffs, Daniel C. Schopp and Norbert Richard Schopp, and against defendant, Our Lady of the Lake Hospital, Inc., is affirmed, at defendant’s costs.
AFFIRMED.

. By the time of trial, Smith had married. Although her last name was Dixon at the time of trial, we shall reler to her as Smith herein.

. Allain never gave the name of the technologist, but we assume it was Smith.

. Mart v. Hill, 505 So.2d 1120, 1127 (La.1987).

. Rosell v. ESCO, 549 So.2d 840, 844 (La.1989).

. Sistler v. Liberty Mutual Ins. Co., 558 So.2d 1106, 1112 (La.1990).

. Stobart v. State, 617 So.2d 880, 883 (La. 1993); Housley v. Cerise, 579 So.2d 973, 976 (La.1991); Sistler, 558 So.2d at 1112.

. In light of our finding on this issue, we need not address defendant’s complaints that the trial court erred in denying its motion for judgment notwithstanding the verdict and motion for new trial.